CORONA KID COMPANY, SUING, &c., FOR THE USE OF CORONA KID MANUFACTURING COMPANY OF MAINE, PLAINTIFF-DEFENDANT IN ERROR, v. JULIUS LICHT-MAN, DEFENDANT-PLAINTIFF IN ERROR.

Submitted July 8, 1912—Decided March 3, 1913.

1. A plaintiff suing in trover and conversion for parts of horse hides sent for tanning to a third person, who sold the parts to the defendant, may show conspiracy, fraud or collusion between the third person and defendant, though the declaration does not allege conspiracy, fraud or collusion.

2. In an action in trover and conversion it is incumbent upon the plaintiff to prove ownership of the goods in controversy and such acts of defendant respecting them as amounted to a repudiation of plaintiff's title or to an exercise of dominion over them, and that fact need not be proved by any particular kind of evidence.

3. Where it appears in an action for trover and conversion that the defendant when he acquired the goods by purchase knew that the third person had no title thereto, and participated with the third person in repudiating the plaintiff's title and in exercising ownership over them, it is not necessary that there should have been a demand and refusal.

4. Where the bookkeeper and general manager of the office of the vendor testified that he had personal knowledge of consignments to the vendee and recorded in the vendor's ledger kept by him, that he made up and presented to the vendee statements of the itemized accounts as they appeared on the ledger, and that the vendee accepted such statements as true, the statements were the best and primary evidence of the facts stated therein.

5. Where a party in possession of writings constituting primary evidence stated in court that the writings were lost or destroyed, true copies of such writings were properly received as secondary evidence.

6. In order for the plaintiff to recover in an action in trover and conversion for parts of horse hides sent for tanning to a third person, who sold them to the defendant, it was not necessary for him to establish fraudulent conduct of defendant, but it was sufficient that the fraud was committed by defendant's agent with his knowledge.

7. Errors assigned upon exceptions to the admission of testimony should point out the specific testimony challenged.

8. Evidence of a conversation between a witness and a third person had in the absence of defendant was proper where the conversation was a part of the history of the production of articles evolved from a tanning process discovered by the third person, and was admitted only for that purpose.

9. Interest may be awarded on the value of the goods in an action for trover and conversion from the time of their conversion as a part of the damages recoverable by plaintiff.

---

On error to the Supreme Court.

For the plaintiff in error, *Riker & Riker.*

For the defendant in error, *Pitney, Hardin & Skinner.*

The opinion of the court was delivered by

KALISCH, J. This writ of error brings under review a judgment of $23,000 obtained by the plaintiff below against the defendant below, in an action for trover and conversion. The main controversy between the parties related to the ownership of certain portions of horse hides sent by the Corona Kid Manufacturing Company, the assignor (for whose use the plaintiff sues), to one Albert Guiges, for tanning. A written contract was entered into between the kid company and Guiges, June 30th, 1904, whereby, *inter alia,* it was agreed that the company was to ship daily certain horse hides for one calendar year, exclusive of Sundays and legal holidays, the said Guiges to tan the same at a certain rate per square foot, to do the work thereon in a first class manner and to make merchantable leather of as good quality as could be produced from the raw stock sent him by the company, and to ship them wherever directed by the company. Guiges also

agreed to keep the horse hides so consigned to him by the company fully insured, the policies payable to the company.

In performing the work under this contract, the grain or hair side of the hide was shaved and these shavings were waste from the standpoint of leather and along with other similar trimmings, the flesh from the hides and the hair taken off, by the custom of trade belong to the tanner. Soon after he commenced operations, Guiges substituted a new process and split instead of scraping a layer from the grain or hair side of the shell. This took a little further quantity from the piece and perhaps injured the kid company's piece a little, and instead of returning the extra piece split off, he sold these, as it is claimed, to the defendant.

On behalf of the defendant it is claimed that by splitting Guiges did what had been before done by shaving, and that as the shavings were waste, so what his ingenuity saved by splitting still remained his as a substitute for waste. The plaintiff produced proof which tended to establish that in November, 1904, a verbal contract was made between the company and Guiges, that he, Guiges, should pursue this method of splitting and should tan the grains thus split off, at a certain rate per foot, and that notwithstanding this agreement Guiges continued to sell the product from the company's horse hides, by this new process of splitting, to the defendant. For the purpose of establishing its ownership of the articles produced by Guiges' new process, the plaintiff adduced testimony that tended to prove a custom of the trade which, in the absence of contract, articles thus produced by a tanner of hides were to be returned to the consignor; the tanner retaining nothing but the waste as the hair only and little scraps from trimming. The plaintiff also relied upon other facts and circumstances establishing its ownership of the articles, and the defendant's knowledge of such ownership by introducing testimony to the effect that Guiges attempted to and did conceal the production of the articles by his new process, and kept a private set of books in which the sales thereof were recorded, the major part of them to the defendant, and that the defendant not only knew of the man-

ner of dealing which Guiges was carrying on but actually participated therein. No denial was made by the defendant of the purchase of the articles of Guiges, nor of the prices paid therefor.

The attack leveled against the validity of the judgment under review, by the plaintiff in error, in his brief, and to which the attention of the court is first directed, is that the plaintiff below was permitted to introduce testimony to show conspiracy, fraud or collusion between the defendant below and Guiges to establish its action of trover and conversion under a declaration in which neither conspiracy, fraud nor collusion was alleged.

This contention is without any force.

Of the many fictions which existed at common law the action of trover and conversion serves as a conspicuous example. If the plaintiff was confined in such an action to proof of the facts as set out in the declaration he would almost invariably fail.

Declarations in this form have been held sufficient to support the introduction of proof that the articles for which damages are sought were stolen, obtained by fraud in various ways, or in a lawful manner and then unlawfully withheld. The character of the proof introduced by the plaintiff to establish its cause of action against the defendant did not change the nature of the action nor the issue that was being tried and imposed no greater burden of proof upon the plaintiff than what is required in an ordinary case of trover and conversion. The nature of the action made it incumbent upon the plaintiff to prove its ownership of the goods and such act or acts of the defendant respecting the same as amounted to a repudiation of the plaintiff's title or to an exercise of dominion, *i. e.,* ownership, over them. *Woodside* v. *Adams,* 11 *Vroom* 417; *Frome* v. *Dennis,* 16 *Id.* 515. It was not necessary to prove this by any particular kind of evidence.

The plaintiff's proofs tended to establish that the defendant when he acquired the goods by purchase knew that Guiges had no title thereto and participated with Guiges in repudi-

ating the plaintiff's title to them and in exercising ownership over them.

It was therefore not necessary for the plaintiff to have shown a demand and refusal, since they are merely evidence of conversion, and there was evidence *aliunde* tending to establish a conversion by the defendant. Chancellor Dwight in *Pease et al.* v. *Smith et al.,* 61 *N. Y.* 477, in commenting upon the necessity of a demand and refusal as a prerequisite to maintaining an action of trover and conversion, says: "As according to these views the conversion took place at the moment of the unauthorized sale by the present defendants, no demand was necessary, the sole object of a demand being to turn an otherwise lawful possession into an unlawful one, by reason of a refusal to comply with it, and thus to supply evidence of a conversion." Testimony establishing a conspiracy or collusion between Guiges and the defendant or any other kind of fraudulent conduct on their part concerning the articles sold to the defendant by Guiges, was competent and relevant testimony to establish a conversion of them by the defendant, and therefore strictly within the issue presented by the declaration. There was testimony which justified the jury in finding that the plaintiff was the owner of the goods, and that the defendant converted them to his own use.

Another reason urged upon us by the plaintiff in error for a reversal of the judgment, is that the trial judge, against the defendant's objection, permitted the plaintiff to introduce in evidence certain sheets of ordinary yellow foolscap, which appeared from the testimony of Elliot, who had been the bookkeeper of Guiges and general manager of the office, to be copies made by him of a ledger account between Guiges and the defendant contained in a ledger of a private set of books, which he, the witness, kept at the direction of Guiges, and which contained, among other entries, itemized accounts of the sales by Guiges to the defendant, the dates when made and the goods consigned, a classification of the articles, the number of pounds, the price per pound and the extensions. The object of this testimony was manifestly to establish with

some degree of certainty the amount of goods belonging to the plaintiff, which came into the possession of the defendant. The witness Elliot further testified that he had personal knowledge of the consignments recorded in the ledger; that he had made up and presented to the defendant statements of the itemized accounts as they appeared upon the ledger and of which the yellow sheets were a true copy and which itemized accounts being examined and checked off by the defendant were paid by him. The defendant did not deny the accuracy of the itemized accounts presented to him, nor did he attempt to controvert the testimony of the witness regarding his, the defendant's, conduct respecting the same. When, at the trial, the defendant was called upon by the plaintiff to produce these original itemized accounts, he excused their non-production upon the plea that they had been lost or destroyed. It is obvious that the defendant's acceptance of the statements of account as true accounts of the transactions between him and Guiges, relating to the purchase of the plaintiff's property by the defendant of Guiges, evidenced as this was by the defendant checking off the items of the statements and paying them, rendered these statements the best and primary evidence of the facts stated therein, in like manner as would have resulted if a letter had been written by the defendant, embracing the items of account, acknowledging that he had received the same and sent his check in payment therefor. It appearing from the defendant's statement in court that the original itemized statements were lost or destroyed, under the well-known rule of evidence, the plaintiff was entitled to give secondary evidence of their contents. As the yellow sheets were testified to by Elliot as being a true copy of the original itemized accounts, both the original statements and the copy having been made by him, the copy was admissible as secondary evidence.

It is further contended by the plaintiff in error that though the son of the defendant, who was his father's agent, knew that Guiges was committing a fraud on the plaintiff, in that he was buying leather at half price because of Guiges' fraudulent conduct, the defendant cannot be charged with the fraudulent conduct of his agent. .

There was evidence in the case from which the jury might infer that the defendant had knowledge of his agent's conduct, not the least being the price at which the goods were purchased. It was a jury question under all the circumstances of the case.

The objection that an innocent principal cannot be held answerable for fraud of an agent is said to be *dictum* in *Kennedy* v. *McKay*, 14 *Vroom* 288. This was founded upon the dissenting opinions of Baron Bramwell and Baron Martin in *Udell* v. *Atherton*, 7 *H. & N.* 172; and which seem to have been followed in *Western Bank of Scotland* v. *Addie, L. R.,* 1 *Scott App.* 146. But in *Barwick* v. *Eng. Joint Stock Co., L. R., 2 Exch.* 265, Mr. Justice Willes said: "The general rule is that the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved. * * * In all these cases it may be said, as it was said here, that the master has not authorized the act. It is true that he has not authorized the particular act, but he has put the agent in his place to do that class of acts, and he must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of the master to place him in." * * * "With respect to the question whether a principal is answerable for the act of his agent in the course of his master's business, and for his master's benefit, no sensible distinction can be drawn between the case of fraud and the case of any other wrong."

The legal rule thus laid down is approved in *Swire* v. *Francis, L. R., 3 App. Cas.* 106, and in *Mackay* v. *Commercial Bank of N. B., L. R., 5 Id.* 412.

In *Houldsworth* v. *City of Glasgow Bank, L. R., 5 App. Cas.* 317 (1879-1880), Lord Selborne, in discussing the legal rule enunciated by Mr. Justice Willes, says: "To the principle so stated, no exception can, in my opinion, be taken, though the manner in which the master is to be answerable, and the nature and extent of the remedies against him, may vary according to the nature and circumstances of particular

cases. The principle received full recognition from this house in *National Exchange Co.* v. *Drew*, 2 *Macq.* 103, and *N. B. Railway Co.* v. *Conybeare*, 9 *H. L. C.* 711, and certainly was not meant to be called in question by either of the learned lords who decided *Addie* v. *Western Bank of Scotland, L. R.*, 1 *H. L. Sc.* 145."

The principle decided in the Addie case was limited to the fraud perpetrated by the agents of a joint stock company inducing the purchase of shares.

In *Lloyd* v. *Grace Smith & Co.* (1912), *L. R. App. Cas.* 716, Lord Macnaghten (at *p.* 731 *et seq.*) gives forceful endorsement of the legal rule as expressed by Mr. Justice Willes in *Barwick* v. *Eng. Joint Stock Co.*, and in a lucid manner points out the extent of its application, and also reviews instructively the earlier English and Scotch cases dealing with the subject.

The cases of *Restman* v. *Florillo*, 47 *Vroom* 815; *Roberts* v. *James*, 54 *Id.* 492, in this court, are in harmony with the doctrine laid down in *Barwick* v. *Eng. Joint Stock Co.*

The matter need not, however, be pursued, as it was not essential to the plaintiff's case to prove the fraudulent conduct of the defendant, and the evidence of the fraud was relevant upon the question of the plaintiff's title to the goods.

The errors assigned upon exceptions to the admission by the trial judge of conversations between the witness Baker and Guiges, in the absence of the defendant, are not in conformity with the settled law, in that neither of them points out the specific testimony, the legality of which is challenged. An examination of the testimony supposedly drawn into question as to its admissibility, discloses that it was given as a part of the history of the production of the articles evolved from the process discovered by Guiges, and it was only for that purpose that it was admitted by the learned judge, and we think properly so.

Nor do we think the court erred in permitting the jury to award interest on the value of the goods from the time of their conversion, as a part of the damages recoverable by the plaintiff. The object to be attained by the award of damages is to

fully compensate the injured party for the loss sustained, and it seems therefore both reasonable and just that the interest on the value of the property from the time of its conversion, when the plaintiff is wrongfully denied the use and benefit of it, should be recoverable as an element of damage arising out of the wrongful conversion.

The judgment will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE, TREACY, JJ. 13.

*For reversal*—None.